## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PARIS ROBINSON,                          )
                Plaintiff,          )
                         )
v.                                       )    Case No:
                         )
FEDEX GROUND PACKAGE                     )    **JURY DEMANDED**
PACKAGE SYSTEM INC. and                  )
TOMMY SMITH,                             )
                Defendants.         )

## COMPLAINT AT LAW

NOW COMES the Plaintiff, Paris Robinson ("Plaintiff"), by and through her undersigned attorneys, and for her Complaint at Law against the Defendants, FedEx Ground Package System, Inc. ("FedEx") and Tommy Smith ("Smith") (collectively, "Defendants"), states as follows:

## NATURE OF THE CASE

1.      That Counts I, II, III, and IV arise under Title VII of the Civil Rights Act 42 U.S.C. § 2000e as amended, 28 U.S.C. § 1331, 28 U.S.C. § 1367 ("Title VII").

2.      That Count V is brought against Defendant Tommy Smith, under the Illinois Gender Violence Act, 740 ILCS 82/*et seq.* and Illinois common law.

3.      That Counts VI and VI arise under Illinois common law.

## JURISDICTION AND VENUE

4.      That this court has jurisdiction over this matter based upon 42 U.S.C. § 2000e, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

5.      That venue in the Northern District of Illinois is proper. The claims for relief arose in Chicago, Cook County, Illinois, as required by 42 U.S.C. § 2000e.

6.      That all conditions precedent have been fulfilled by Plaintiff, including the filing of a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). Charge Number 846-2018-17947 is attached hereto and incorporated herein as Exhibit A.

7.      Plaintiff has received the requisite Notice of Right to Sue letter from the EEOC dated December 10, 2018 (Exhibit B), thus entitling her to bring this action in the Federal Court of the Northern District of Illinois.

## **PARTIES**

8.      Plaintiff is female and a resident of Cook County, Illinois.

9.      FedEx is duly registered to conduct business in the state of Illinois.

10.     At the time of the incidents claimed herein, FedEx was an "Employer" within the meaning of Title VII of the Civil Rights Act.

11.     At all times pertinent hereto, Defendant FedEx has engaged in an industry affecting commerce and has had fifteen (15) or more employees for each working day in each of the twenty (20) or more calendar weeks in the current or preceding calendar year.

12.     That at all times pertinent herein, Plaintiff was employed by FedEx.

13.     Plaintiff was hired by FedEx in November 2017 as a Senior Operations Administrative Assistant 1 and worked at FedEx Unit 605 located at 6833 West 75th Street, Bedford Park, Illinois.

14.     That at all times pertinent herein, Smith was employed by FedEx.

15.     That at all times pertinent herein, Smith was a male and a resident of Illinois.

16.     That Smith had trained Plaintiff for the position she was employed in at FedEx.

17.     That at all times, Smith was employed by FedEx as a Senior Operations Administrative
        Assistant at FedEx Unit 605 located at 6833 West 75th Street, Bedford Park, Illinois.

18.     Smith trained Plaintiff at the time that she was hired at FedEx.

19.     Plaintiff was an administrative assistant who sorted boxes, performed quality control and
        assisted other FedEx employees in the completion of their duties.

20.     FedEx provided instructions to Plaintiff how to perform her duties.

21.     FedEx provided the location for Plaintiff to perform her duties.

22.     FedEx provided Plaintiff with the tools to perform her duties.

## Count I

## Sexual Harassment

23.     The Plaintiff incorporates the preceding paragraphs by reference herein.

24.     This count is directed to Defendant FedEx.

25.     That from approximately November 2017 and to April 23, 2018, Plaintiff was subjected
        to unwelcome sexual advances, sexual comments, and other physical and verbal conduct
        of a sexual nature from Smith, based on her sex, female.

26.     That in November 2017, Smith referred to Plaintiff as "baby", "boo", "baby mama", and
        "wifey" to Plaintiff at least once a day.

27.     That Plaintiff rejected Smith's advances by stating that she was not interested, that she
        did not date coworkers and that they were not together.

28.     That in November 2017, Smith would touch Plaintiff's waist and back without her
        permission while examining her equipment belt.

29. That Plaintiff rejected this unwanted touching by stepping away from Smith.

30. That from November 2017 to March 2018, Smith would tell other employees of Defendant that he and Plaintiff were sleeping together and that they were dating.

31. That several employees of Defendant approached Plaintiff and told her that Smith was spreading rumors.

32. That Plaintiff informed the employees that she and Defendant were not sleeping together and that they were not dating.

33. That from November 2017 to April 2018, Smith would follow Plaintiff to different areas of the Defendant's warehouse.

34. That the areas of the warehouse where Smith followed Plaintiff were not areas that Smith was required to be in to complete his job duties.

35. That approximately two to three times a week between November 2017 and March 2018, Smith would stand behind Plaintiff and stare at Plaintiff while she worked.

36. That from November 2017 to April 2018, Smith would drive past Plaintiff on a factory cart, stop, and stare at Plaintiff while she worked.

37. That in February 2018, after a car accident and related back injury, Plaintiff was scheduled to work in the scanner cage.

38. That while Plaintiff was working in the scanner cage, Smith would come into the cage and browse for items for extended periods of time to be near Plaintiff.

39. That Plaintiff felt creeped out by Smith following her to areas that he did not work in.

40. That in December 2017 Plaintiff reported Smith's conduct to FedEx by contacting the business manager in charge of human resources, Janelle King ("King").

41. Plaintiff spoke with King and told her about Smith's conduct, and King told Plaintiff that FedEx would launch an investigation.

42. That after Plaintiff complained to King, Plaintiff began suffering from further harassment by Smith and other employees of Defendant.

43. That in March 2018 King told Plaintiff that the investigation had concluded.

44. That in February 2018, while Plaintiff was working in the scanner cage, a female employee of Defendant, Robin LNU ("Robin") entered the scanner cage, screamed at Plaintiff, and accused Plaintiff of lying and faking her back injury.

45. That while Robin was screaming at Plaintiff, Smith stood inside the scanner cage and watched on.

46. That following the incident in the scanner cage, HR reassigned Robin to work on the floor.

47. That in March 2018, King informed Plaintiff in passing that after speaking to the nine team members in Plaintiff's department, Plaintiff's allegations were "founded."

48. That King told Plaintiff that "founded" meant that someone in Plaintiff's department corroborated her statement.

49. That in March 2018, approximately a week after King told Plaintiff that Plaintiff's allegations were "founded," Smith was promoted and received a raise.

50. That Smith was never penalized by Defendant for his conduct.

51. That following the HR investigation, other employees of Defendant approached Plaintiff accusing her of sleeping with Smith and being involved with him.

52. That following the HR investigation, other male employees of Defendant approached Plaintiff and questioned whether she would file harassment claims against them.

53. That following the HR investigation, other female employees of Defendant approached Plaintiff and accused her of lying about Smith's conduct.

54. That the same female employees would physically and verbally attack Plaintiff, body-shame her and comment on her physical appearance to undermine her.

55. That the female employees would physically and verbally attack Plaintiff while Smith stood and watched on.

56. That when Plaintiff reported the conduct of female employees to HR, HR asked Plaintiff what she did to provoke the employees instead of expressing concern for Plaintiff's safety.

57. That following the HR investigation, Smith spread rumors to other employees of Defendant that Plaintiff was having sexual relations with other individuals.

58. That in addition to spreading rumors, Smith called Plaintiff a "whore" and told her that "she was acting light-skinned" multiple times following her complaint to HR.

59. That Plaintiff complained to King and her supervisor, Bill LNU ("Bill") about the harassing statements and conduct of her fellow employees.

60. That no further investigation was conducted by Defendant's HR in response to Plaintiff's later complaints.

61. That Defendant's failure to penalize Smith, to take subsequent action, and to respond to Plaintiff's continued complaints of Smith's misconduct resulted in Smith and other employees of Defendant continuously subjecting Plaintiff to sexual harassment that was severe, persistent in nature, unwelcome, extremely offensive, humiliating, and effective in creating a hostile and intimidating work environment for Plaintiff that substantially interfered with her ability to perform her job.

62.     That Defendant condoned sexual harassment and failed to maintain a harassment-free work environment by failing to penalize Smith and by failing to provide adequate training, counseling, discipline, and instructions to its employees.

63.     That as a result of these failures by Defendants, Smith continuously subjected Plaintiff to sexual harassment that was severe, persistent in nature, unwelcome, extremely offensive, humiliating, and effective in creating a hostile and intimidating work environment for Plaintiff that substantially interfered with her ability to perform her job.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a. Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b. Order a permanent injunction prohibiting Defendant from further acts of sexual harassment and discrimination.

c. Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d. Award Plaintiff a judgment against Defendant for reinstatement, front pay, back pay and other compensatory damages.

e. Award Plaintiff prejudgment interest.

f. Grant judgment against Defendant for punitive damages as permitted by law, for willful and wanton conduct.

g. Enter an order requiring Defendant to implement effective steps to eliminate sexual harassment and discrimination from Defendants' workplace.

h. Grant such other and further relief as this Court deems just and proper.

## Count II

### Sexual Discrimination

64.     The Plaintiff incorporates the proceeding paragraphs by reference herein.

65.     This count is directed at Defendant FedEx.

66.     That Plaintiff's sex is female.

67.    That Plaintiff's job performance met Defendant's legitimate expectations.

68.    That from approximately November 2017 and continuing to April 23, 2018, Plaintiff was subjected to unwelcome sexual advances, sexual comments and other physical and verbal conduct of a sexual nature from FedEx's employee, Smith, based on her sex, female.

69.    That Plaintiff repeatedly rejected Smith's sexual advances and harassment.

70.    That Smith did not make unwelcome sexual advances, sexual comments and other physical and verbal conduct of sexual nature to employees similarly situated to the Plaintiff.

71.    That Smith committed these acts because the Plaintiff is a female.

72.    That in December 2017, Plaintiff reported Smith's unwelcome sexual advances, sexual comments, and other physical and verbal conduct of sexual nature to FedEx's human resource department.

73.    That in December 2017, FedEx's business manager, King, opened an investigation into Plaintiff's complaints of sexual harassment.

74.    That in March 2018, King informed Plaintiff that her complaints against Smith were "founded."

75.    That King told Plaintiff that "founded" meant that someone in Plaintiff's department collaborated her statement.

76.    That in March 2018, approximately a week after King told Plaintiff that Plaintiff's allegations were "founded," Smith was promoted and received a raise.

77.    That Smith was never penalized by Defendant for his conduct.

78.     That following the complaint and subsequent HR investigation, other employees of Defendant approached Plaintiff accusing her of sleeping with Smith and being involved with him.

79.     That following the HR investigation, other male employees of Defendant approached Plaintiff and questioned whether she would file harassment claims against them.

80.     That in February 2018, while Plaintiff was working in the scanner cage, a female employee of Defendant, Robin, entered the scanner cage, screamed at Plaintiff, and accused Plaintiff of lying and faking her back injury.

81.     That while Robin was screaming at Plaintiff, Smith stood inside the scanner cage and watched on.

82.     That following the incident in the scanner cage, HR reassigned Robin to work on the floor.

83.     That following the HR investigation, other female employees of Defendant approached Plaintiff and accused her of lying about Smith's conduct.

84.     That the same female employees would physically and verbally attack Plaintiff, body shaming her and commenting on her physical appearance to undermine her.

85.     That the female employees would physically and verbally attack Plaintiff while Smith stood and watched on.

86.     That Plaintiff complained to King and her supervisor, Bill about the harassing statements and conduct of her fellow employees.

87.     That following the HR investigation, Plaintiff began to receive disciplinary "write-ups."

88.     That in or about March 2018, Plaintiff received her first write-up for being on her cellphone.

89. That this write-up was unfounded and illegitimate because as an administrative assistant, Plaintiff is permitted to have her cellphone at work due to her position within Defendant FedEx.

90. That Plaintiff was using her cellphone to contact her 9 year-old son to ensure that he was safe, and that Plaintiff had previously informed Defendant FedEx of the need to call her son.

91. That after Plaintiff received the write-up, she signed the write-up because she felt as though she was obligated.

92. That after Plaintiff received the write-up, she asked for a policy and procedures book from Human Resources so she could avoid future write-ups.

93. That Plaintiff never received such a policy and procedures handbook from Defendant.

94. That after this first write-up, Plaintiff received six (6) or seven (7) additional write-ups for small infractions.

95. That for such subsequent write-ups, Plaintiff refused to sign them, after being informed by a friend who works in HR that she was not obligated to do so.

96. That Kevin Reilly ("Reilly"), Team Manager and Supervisor of Plaintiff, was angered by Plaintiff's refusal to sign the subsequent write-ups.

97. That Reilly would question if Plaintiff had an attitude each time she was given a write-up.

98. That sometime after Plaintiff's car accident in January 2018, Plaintiff scheduled an MRI for her back related to her injury and called off so that she could attend the MRI.

99. That Plaintiff's MRI was rescheduled, but Plaintiff had used her PTO to attend the MRI, so Plaintiff did not report to work.

100. That because Plaintiff did not report to work, she received a write-up for being "no call, no show" because her supervisors insisted that she should have reported for work, despite having the day off using her PTO.

101. That Plaintiff did not sign this write-up.

102. That Smith reported Plaintiff's actions, work ethic, and conduct to Reilly.

103. That Smith would report Plaintiff's actions, work ethic, and conduct to Reilly via radio so that other employees of Defendant FedEx could hear the complaints.

104. That Reilly would question Plaintiff's work ethic and whether or not she was able to do her job, following Smith's reports.

105. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage, Plaintiff was responsible for updating spreadsheets with information regarding Defendant's employees checks and for distributing employee checks.

106. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, Plaintiff would update the spreadsheets to reflect if an employee check had been received in the scanner cage to be subsequently distributed.

107. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, checks would go missing or appear to be misplaced, even though Plaintiff had updated the spreadsheets to reflect that the checks were received in the scanner cage.

108. That due to checks being missing or misplaced, Plaintiff was forced to work past her designated shift time of 11:00 P.M. to find and distribute the checks to Defendant's employees.

109.   That Defendant's employees blamed Plaintiff for the checks being missing and misplaced and it appeared as though Plaintiff was unqualified to perform her duties.

110.   That employees of Defendant, including Smith had access to the scanner cage and its contents.

111.   That Plaintiff suspects that Smith and other employees of Defendant that had engaged in hostile conduct against Plaintiff were purposefully taking or misplacing employee checks to cause Plaintiff to appear unqualified to perform her duties.

112.   That from March 2018 to April 2018, Smith and Reilly would radio Plaintiff and inform her that the slide with packages was filling up to make it seem that Plaintiff was not doing her job.

113.   That in March 2018, Smith and Reilly began to alienate Plaintiff from other employees of Defendant FedEx.

114.   That in March 2018, in a meeting of Defendant FedEx employees, Reilly informed the meeting's attendees about how much money Plaintiff was making and that Plaintiff did not "work her way up" from a lower role within Defendant FedEx's company.

115.   That when Plaintiff reported this incident to her supervisor Bill and King, they told her to "take it with a grain of salt."

116.   That when Plaintiff reported Smith's reports to Reilly regarding her conduct to supervisors Bill and King, she was given a "Code of Business Conduct and Ethics."

117.   That in March 2018, an employee of Defendant FedEx, Amy LNU ("Amy"), approached Plaintiff in the cafeteria while Plaintiff was on the phone with her son.

118.   That Amy is not a supervisory employee of Defendant FedEx.

119. That while Plaintiff was on the phone with her son, Amy approached Plaintiff and questioned why Plaintiff had her cellphone.

120. That when Plaintiff told Amy that she was allowed to have her cellphone because of her position within FedEx, Amy reported Plaintiff to her boss, Marcus LNU ("Marcus").

121. That following Amy's report, Marcus called Plaintiff into his office and asked "why do you think you're here."

122. That Marcus told Plaintiff that she was brought into his office because she had her cellphone on the warehouse floor and that he would need to issue Plaintiff a write-up.

123. That Marcus told Plaintiff that he would not issue a write-up because he understood that she was on the phone to speak with her son.

124. That from March 2018 to April 2018, Bill and King disregarded many of Plaintiff's complaints of harassing and discriminatory conduct by Defendant FedEx employees.

125. That in March 2018, Plaintiff approached Bill to ask him for the corporate phone number of Defendant FedEx.

126. That Bill could not provide the phone number for corporate, so he sent Plaintiff to King.

127. That instead of providing Plaintiff with the corporate phone number, King provided Plaintiff with Bill's phone number, which Plaintiff already had.

128. That in March 2018, Plaintiff was offered a reassignment for her shift to be changed so that she did not have to interact with Smith.

129. That the offered reassignment would change Plaintiff's hours from 2:00 P.M. to 11 P.M. to 12:00 A.M. to 5:00 A.M.

130. That Plaintiff felt as though Smith should be the one to change his shift, as he was the harasser.

131.    That Plaintiff was unable to accept the shift assignment because her method of transportation to work, the Pace bus, only ran until 11:00 P.M., and Plaintiff had no other method of transportation to accommodate the proposed shift change hours.

132.    That in March 2018, a member from Plaintiff's team was promoted, and following this promotion, Reilly called Plaintiff into his office for a private meeting.

133.    That in their private meeting, Reilly assigned Plaintiff the duties of her promoted co-worker because "she was the best administrative assistant."

134.    That Plaintiff informed Reilly that there was no way that she could fulfill her already assigned duties and the duties of her promoted co-worker.

135.    That Plaintiff asked if the duties of her promoted co-worker could be distributed among her team evenly due to Plaintiff's injuries from her January 2018 car accident.

136.    That Reilly told Plaintiff she was solely responsible for her promoted co-workers duties because she was paid the most, and that "there should be no problem" with her adopting the duties.

137.    That Plaintiff went to HR following this meeting, and King echoed Reilly stating that "there should be no problem."

138.    That Plaintiff's already assigned duties required Plaintiff to operate "Slide C," which required Plaintiff to manage 20,000 to 90,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours, to perform quality control, and to assist approximately 17 employees of Defendant in the performance of their duties.

139.    That Plaintiff was unable to perform her already assigned duties due to the injuries from her January 2018 car accident and subsequent reassignment to the scanner cage.

140. That the duties of Plaintiff's promoted co-worker required Plaintiff to operate an additional package slide, which could require Plaintiff to manage an additional 20,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours.

141. That Plaintiff was unable to perform additional duties due to the injuries from her January 2018 car accident, as the duties of her promoted co-worker required lifting from fifty (50) to one hundred (100) pounds, which often required help.

142. That Reilly assigned Plaintiff these duties after he was aware of Plaintiff's injuries and the accommodations provided by Plaintiff's doctor.

143. That Reilly assigned these duties to Plaintiff because of her complaint against Smith, her higher pay rate, and because of her sex, female.

144. That Reilly questioned Plaintiff after her unwillingness to assume the duties of her promoted co-worker.

145. That Reilly informed Plaintiff that she was required to stay past 11:00 P.M. to finish all of her duties, which included the duties of her promoted co-worker.

146. That Plaintiff informed Reilly that this conflicted with her transportation needs, the Pace bus, which required Plaintiff to take the last bus at 11:00 P.M.

147. That when Plaintiff informed Reilly that she needed to leave in order to take the 11:00 Pace bus, Reilly asked Plaintiff "are you saying you're not going to do your job?"

148. That from March 2018 to April 2018, when Plaintiff requested paid time off (PTO), her requests were denied and her supervisors suggested that she switch shifts with other employees.

149. That Plaintiff was denied the use of her PTO, which she was entitled to use.

150. That in April 2018, when Plaintiff requested to use her PTO on April 23, 2018 for her son's birthday, her supervisors questioned whether or not she needed to use the PTO and whether she could just switch shifts with another employee, after Plaintiff was originally granted the PTO.

151. That Plaintiff was unable to switch shifts with other employees due to the alienation she faced after reporting Smith's conduct to the human resources department, and the alienation created by Smith and Reilly.

152. That Defendant FedEx's employees, including Smith and Reilly, created an employment so hostile and intimidating that it substantially interfered with Plaintiff's ability to perform her job thus forcing resignation, due to Plaintiff's rejection of Smith's advances and harassment, which was based on her gender.

153. That Smith and Reilly did not create an employment environment so hostile and intimidating as to force resignation for any similarly situated male employees for the rejection of sexual advances.

154. That on April 24, 2018, Plaintiff did not return to her employment with Defendant FedEx as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx.

155. That Defendant constructively discharged Plaintiff because she was female and engaged in the protected activity of reporting sexual harassment.

156. That each Defendant was responsible for aiding and abetting the other Defendants in causing Plaintiff's constructive discharge due to her sex and that each Defendant was

acting in concert with the other Defendants in causing Plaintiff's constructive discharge due to her sex.

157.   That Plaintiff found the discrimination exhibited by Defendant to be offensive.

158.   That the sexual discrimination was severe, extremely offensive, humiliating, and effective in creating an unproductive work environment for Plaintiff that substantially interfered with her ability to perform her job.

159.   That said sexual discrimination adversely affected the terms and conditions of Plaintiff's employment with Defendant FedEx.

160.   That Defendant FedEx and its agents were aware of these discriminatory and illegal practices because Plaintiff brought the issues to Defendant's attention, yet Defendant failed to take corrective action.

161.   That Defendant violated Plaintiff's civil rights by discriminating against her as a result of her sex, female, in violation of Title VII and Section 2-102(A) of the IHRA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a.   Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b.   Order a permanent injunction prohibiting Defendant from further acts of sexual harassment and discrimination.

c.   Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d.   Award Plaintiff a judgment against Defendant for reinstatement, front pay, back pay and other compensatory damages.

e.   Award Plaintiff prejudgment interest.

f.   Grant judgment against Defendant for punitive damages as permitted by law, for willful and wanton conduct.

g.  Enter an order requiring Defendant to implement effective steps to eliminate sexual harassment and discrimination from Defendant's workplace.

h.  Grant such other and further relief as this Court deems just and proper.

## Count III
### Retaliation

162.  The Plaintiff incorporates the proceeding paragraphs by reference herein.

163.  This count is directed at Defendant FedEx.

164.  That Plaintiff's job performance met Defendant's legitimate expectations.

165.  That from approximately November 2017 through April 2018, Plaintiff was subjected to sexual harassment at the hands of FedEx's employee, Smith.

166.  That Plaintiff opposed Smith's sexual advances and harassment and engaged in protected activity by opposing sexual harassment and Smith's request for a sexual relationship.

167.  That in December 2017, Plaintiff reported Smith's unwelcome sexual advances, sexual comments, and other physical and verbal conduct of sexual nature to FedEx's human resource department.

168.  That in December 2017, FedEx's business manager, King, opened an investigation into Plaintiff's complaints of sexual harassment.

169.  That in March 2018, King informed Plaintiff that her complaints against Smith were "founded."

170.  That King told Plaintiff that "founded" meant that someone in Plaintiff's department collaborated her statement.

171.  That in March 2018, approximately a week after King told Plaintiff that Plaintiff's allegations were "founded," Smith was promoted and received a raise.

172.  That Smith was never penalized by Defendant for his conduct.

173.   That following the HR investigation, other employees of Defendant approached Plaintiff accusing her of sleeping with Smith and being involved with him.

174.   That following the HR investigation, other male employees of Defendant approached Plaintiff and questioned whether she would file harassment claims against them.

175.   That in February 2018, while Plaintiff was working in the scanner cage, a female employee of Defendant, Robin entered the scanner cage, screamed at Plaintiff, and accused Plaintiff of lying and faking her back injury.

176.   That while Robin was screaming at Plaintiff, Smith stood inside the scanner cage and watched on.

177.   That following the incident in the scanner cage, HR reassigned Robin to work on the floor.

178.   That following the HR investigation, other female employees of Defendant approached Plaintiff and accused her of lying about Smith's conduct.

179.   That the same female employees would physically and verbally attack Plaintiff, body shame her and comment on her physical appearance to undermine her.

180.   That the female employees would physically and verbally attack Plaintiff while Smith stood and watched on.

181.   That Plaintiff complained to King and her supervisor, Bill, about the harassing statements and conduct of her fellow employees.

182.   That following the HR investigation, Plaintiff began to receive disciplinary "write-ups."

183.   That in or about March 2018, Plaintiff received her first write-up for being on her cellphone.

184. That this write-up was unfounded and illegitimate because as an administrative assistant, Plaintiff is permitted to have her cellphone at work due to her position within Defendant FedEx.

185. That Plaintiff was using her cellphone to contact her 9 year-old son to ensure that he was safe, and that Plaintiff had previously informed Defendant FedEx of the need to call her son.

186. That after Plaintiff received the write-up, she signed the write-up because she felt as though she was obligated.

187. That after Plaintiff received the write-up, she asked for a policy and procedures book from Human Resources so she could avoid future write-ups.

188. That Plaintiff never received the handbook that she requested.

189. That after this first write-up, Plaintiff received six (6) or seven (7) additional write-ups for small infractions from her supervisor, Reilly.

190. That for such subsequent write-ups, Plaintiff refused to sign them, after being informed by a friend who works in HR that she was not obligated to do so.

191. That Reilly was angered by Plaintiff's refusal to sign the subsequent write-ups.

192. That Reilly would question if Plaintiff had an attitude each time she was given a write-up.

193. That sometime after Plaintiff's accident in January 2018, Plaintiff scheduled an MRI for her back related to her injury and called off so that she could attend the MRI.

194. That Plaintiff's MRI was rescheduled, but Plaintiff had used her PTO to attend the MRI, so Plaintiff did not report to work.

195.   That because Plaintiff did not report to work, she received a write-up for being "no call, no show" because her supervisors insisted that she should have reported for work, despite having the day off using her PTO.

196.   That Plaintiff did not sign this write-up.

197.   That Smith reported Plaintiff's actions, work ethic, and conduct to Reilly.

198.   That Smith would report Plaintiff's actions, work ethic, and conduct to Reilly via radio so that other employees of FedEx could hear the complaints.

199.   That Reilly would question Plaintiff's work ethic and whether or not she was able to do her job, following Smith's reports.

200.   That from February 2018 to April 2018, while Plaintiff was working in the scanner cage, Plaintiff was responsible for updating spreadsheets with information regarding Defendant's employees checks and for distributing employee checks.

201.   That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, Plaintiff would update the spreadsheets to reflect if an employee check had been received in the scanner cage to be subsequently distributed.

202.   That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, checks would go missing or appear to be misplaced, even though Plaintiff had updated the spreadsheets to reflect that the checks were received in the scanner cage.

203.   That due to checks being missing or misplaced, Plaintiff was forced to stay past 11:00 P.M. to find and distribute the checks to Defendant's employees.

204.   That Defendant's employees blamed Plaintiff for the checks being missing and misplaced and it appeared as though Plaintiff was unqualified to perform her duties.

205. That employees of Defendant, including Smith had access to the scanner cage and its contents.

206. That Plaintiff suspects that Smith and other employees of Defendant that had engaged in hostile conduct against Plaintiff were purposefully taking or misplacing employee checks to cause Plaintiff to appear unqualified to perform her duties.

207. That from March 2018 to April 2018, Smith and Reilly would radio Plaintiff and inform her that the slide with packages was filling up to make it seem that Plaintiff was not doing her job.

208. That in March 2018, Smith and Reilly began to alienate Plaintiff from other employees of Defendant FedEx.

209. That in March 2018, in a meeting of Defendant FedEx employees, Reilly informed the meeting's attendees about how much Plaintiff was making and that Plaintiff did not "work her way up" from a lower role within Defendant FedEx's company.

210. That when Plaintiff reported this incident to her supervisor Bill and King, they told her to "take it with a grain of salt."

211. That when Plaintiff reported Smith's reports to Reilly regarding her conduct to her supervisor Bill and King, she was given a "Code of Business Conduct and Ethics."

212. That in March 2018, an employee of Defendant FedEx, Amy, approached Plaintiff in the cafeteria while Plaintiff was on the phone with her son.

213. That Amy is not a supervisory employee of Defendant FedEx.

214. That while Plaintiff was on the phone with her son, Amy approached Plaintiff and questioned why Plaintiff had her cellphone.

215. That when Plaintiff told Amy that she was allowed to have her cellphone because of her position within FedEx, Amy reported Plaintiff to her boss, Marcus.

216. That following Amy's report, Marcus called Plaintiff into his office and asked "why do you think you're here."

217. That Marcus told Plaintiff that she was brought into his office because she had her cellphone on the warehouse floor and that he would need to issue Plaintiff a write-up.

218. That Marcus told Plaintiff that he would not issue a write-up because he understood that she was on the phone to speak with her son.

219. That from March 2018 to April 2018, Bill and King disregarded many of Plaintiff's complaints of harassing and discriminatory conduct by Defendant FedEx employees.

220. That in March 2018, Plaintiff approached Bill to ask him for the corporate phone number of Defendant FedEx.

221. That Bill could not provide the phone number for corporate, so he sent Plaintiff to King.

222. That instead of providing Plaintiff with the corporate phone number, King provided Plaintiff with Bill's phone number, which Plaintiff already had.

223. That in March 2018, Plaintiff was offered a reassignment for her shift be changed so that she did not have to interact with Smith.

224. That the offered reassignment would change Plaintiff's hours from 2:00 P.M. to 11 P.M. to 12:00 A.M. to 5:00 A.M.

225. That Plaintiff felt as though Smith should be the one to change his shift, as he was the harasser.

226. That Plaintiff was unable to accept the shift assignment because her method of transportation to work, the Pace bus, only ran until 11:00 P.M., and Plaintiff had no other method of transportation to accommodate the proposed shift change hours.

227. That in March 2018, a member from Plaintiff's team was promoted, and following this promotion, Reilly called Plaintiff into his office for a private meeting.

228. That in their private meeting, Reilly assigned Plaintiff the duties of her promoted co-worker because "she was the best administrative assistant."

229. That Plaintiff informed Reilly that there was no way that she could fulfill her already assigned duties and the duties of her promoted co-worker.

230. That Plaintiff asked if the duties of her promoted co-worker could be distributed among her team evenly due to Plaintiff's injuries from her January 2018 car accident.

231. That Reilly told Plaintiff she was solely responsible for her promoted co-workers duties because she was paid the most, and that "there should be no problem" with her adopting the duties.

232. That Plaintiff went to HR following this meeting, and King echoed Reilly stating that "there should be no problem."

233. That Plaintiff's already assigned duties required Plaintiff to operate "Slide C," which required Plaintiff to manage 20,000 to 90,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours, to perform quality control, and to assist approximately 17 employees of Defendant in the performance of their duties.

234. That Plaintiff was unable to perform her already assigned duties due to the injuries from her January 2018 car accident and subsequent reassignment to the scanner cage.

235. That the duties of Plaintiff's promoted co-worker required Plaintiff to operate an additional package slide, which could require Plaintiff to manage an additional 20,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours.

236. That Plaintiff was unable to perform additional duties due to the injuries from her January 2018 car accident, as the duties of her promoted co-worker required lifting from fifty (50) to one hundred (100) pounds, which often required help.

237. That Reilly assigned Plaintiff these duties after he was aware of Plaintiff's injuries and the accommodations provided by Plaintiff's doctor.

238. That Reilly assigned these duties to Plaintiff because of her complaint against Smith, her higher pay rate, and because of her sex, female.

239. That Reilly questioned Plaintiff after her unwillingness to assume the duties of her promoted co-worker.

240. That Reilly would ask Plaintiff if she had an attitude when speaking to him.

241. That Reilly would frequently accuse Plaintiff of having an attitude when speaking to him.

242. That Reilly informed Plaintiff that she was required to stay past 11:00 P.M. to finish all of her duties, which included the duties of her promoted co-worker.

243. That Plaintiff informed Reilly that this conflicted with her transportation needs, the Pace bus, which required Plaintiff to take the last bus at 11:00 P.M.

244. That when Plaintiff informed Reilly that she needed to leave in order to take the 11:00 Pace bus, Reilly asked Plaintiff "are you saying you're not going to do your job?"

245. That from March 2018 to April 2018, when Plaintiff requested paid time off (PTO), her requests were denied and her supervisors suggested that she switch shifts with other employees.

246. That Plaintiff was denied the use of her PTO, which she was entitled to use.

247. That in April 2018, when Plaintiff requested to use her PTO on April 23, 2018 for her son's birthday, her supervisors questioned whether or not she needed to use the PTO and whether she could just switch shifts with another employee, after Plaintiff was originally granted the PTO.

248. That Plaintiff was unable to switch shifts with other employees due to the alienation she faced after reporting Smith's conduct to the human resources department, and the alienation created by Smith and Reilly.

249. That on April 24, 2018, Plaintiff did not return to her employment with Defendant FedEx as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx.

250. That these adverse actions occurred shortly after Plaintiff engaged in the protected activity of opposing and reporting sexual harassment and requests for a sexual relationship.

251. That the adverse actions stated above followed the protected activity within such a period of time as to raise an inference of retaliatory motivation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a. Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b. Order a permanent injunction prohibiting Defendant from further acts of sexual harassment and discrimination.

c. Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d. Award Plaintiff a judgment against Defendant for reinstatement, front pay, back pay and other compensatory damages.

e. Award Plaintiff prejudgment interest.

f. Grant judgment against Defendant for punitive damages as permitted by law, for willful and wanton conduct.

g. Enter an order requiring Defendant to implement effective steps to eliminate sexual harassment and discrimination from Defendant's workplace.

h. Grant such other and further relief as this Court deems just and proper.

## Count IV

## Constructive Discharge

252. The Plaintiff incorporates the proceeding paragraphs by reference herein.

253. This count is directed at Defendant FedEx.

254. That Plaintiff's job performance met Defendant's legitimate expectations.

255. That from approximately November 2017 and to April 23, 2018, Plaintiff was subjected to unwelcome sexual advances, sexual comments, and other physical and verbal conduct of a sexual nature from Smith, based on her sex, female.

256. That in November 2017, Smith referred to Plaintiff as "baby", "boo", "baby mama", and "wifey" to Plaintiff at least once a day.

257. That Plaintiff rejected Smith's advances by stating that she was not interested, that she did not date coworkers and that they were not together.

258. That in November 2017, Smith would touch Plaintiff's waist and back without her permission while examining her equipment belt.

259. That Plaintiff rejected this unwanted touching by stepping back from Smith.

260.    That from November 2017 to March 2018, Smith would tell other employees of Defendant that he and Plaintiff were sleeping together and that they were dating.

261.    That several employees of Defendant approached Plaintiff and told her that Smith was spreading rumors.

262.    That Plaintiff informed the employees that she and Smith were not sleeping together and that they were not dating.

263.    That from November 2017 to April 2018, Smith would follow Plaintiff to different areas of the Defendant's warehouse.

264.    That the areas of the warehouse where Smith followed Plaintiff were not areas that Smith was required to be in to complete his job duties.

265.    That approximately two to three times a week between November 2017 and March 2018, Smith would stand behind Plaintiff and stare at Plaintiff while she worked.

266.    That from November 2017 to April 2018, Smith would drive past Plaintiff on a factory cart, stop, and stare at Plaintiff while she worked.

267.    That in February 2018, after a car accident and related back injury, Plaintiff was scheduled to work in the scanner cage.

268.    That while Plaintiff was working in the scanner cage, Smith would come into the cage and browse for items for extended periods of time to be near Plaintiff.

269.    That Plaintiff felt creeped out by Smith following her to areas that he did not work in.

270.    That in December 2017 Plaintiff reported Smith's conduct to Defendant FedEx by contacting the business manager in charge of human resources, King.

271.    Plaintiff spoke with King and told her about Smith's conduct, and King told Plaintiff that FedEx would launch an investigation.

272.   That after Plaintiff complained to King, Plaintiff began suffering from further harassment by Smith and other employees of Defendant.

273.   That the HR investigation spanned from December 2017 to March 2018.

274.   That in March 2018, King informed Plaintiff in passing that after speaking to the nine team members in Plaintiff's department, Plaintiff's allegations were "founded."

275.   That King told Plaintiff that "founded" meant that someone in Plaintiff's department collaborated her statement.

276.   That in March 2018, approximately a week after King told Plaintiff that Plaintiff's allegations were "founded," Smith was promoted and received a raise.

277.   That Smith was never penalized by Defendant for his conduct.

278.   That following the HR investigation, other employees of Defendant approached Plaintiff accusing her of sleeping with Smith and being involved with him.

279.   That following the HR investigation, other male employees of Defendant approached Plaintiff and questioned whether she would file harassment claims against them.

280.   That following the HR investigation, other female employees of Defendant approached Plaintiff and accused her of lying about Smith's conduct.

281.   That the same female employees would physically and verbally attack Plaintiff, body shaming her and commenting on her physical appearance to undermine her.

282.   That the female employees would physically and verbally attack Plaintiff while Smith stood and watched on.

283.   That when Plaintiff reported the conduct of female employees to HR, HR would ask Plaintiff what she did to provoke the employees instead of expressing concern for Plaintiff's safety.

284. That following the HR investigation, Smith spread rumors to other employees of Defendant that Plaintiff was having sexual relations with other individuals.

285. That in addition to spreading rumors, Smith called Plaintiff a "whore" and told her that "she was acting light-skinned."

286. That Plaintiff complained to King and her supervisor, Bill about the harassing statements and conduct of her fellow employees.

287. That no further investigation was conducted by the human rights department of Defendant in response to Plaintiff's later complaints.

288. That following the HR investigation, Plaintiff began to receive disciplinary "write-ups."

289. That in or about March 2018, Plaintiff received her first write-up for being on her cellphone.

290. That this write-up was unfounded and illegitimate because as an administrative assistant, Plaintiff is permitted to have her cellphone at work due to her position within Defendant FedEx.

291. That Plaintiff was using her cellphone to contact her 9 year-old son to ensure that he was safe, and that Plaintiff had previously informed Defendant FedEx of the need to call her son.

292. That after Plaintiff received the write-up, she signed the write-up because she felt as though she was obligated.

293. That after Plaintiff received the write-up, she asked for a policy and procedures book from Human Resources so she could avoid future write-ups.

294. That after this first write-up, Plaintiff received six (6) or seven (7) additional write-ups for small infractions.

295. That for such subsequent write-ups, Plaintiff refused to sign them, after being informed by a friend who works in HR that she was not obligated to do so.

296. That Reilly was angered by Plaintiff's refusal to sign the subsequent write-ups.

297. That Reilly would question if Plaintiff had an attitude each time she was given a write-up.

298. That sometime after Plaintiff's accident in January 2018, Plaintiff scheduled an MRI for her back related to her injury and called off so that she could attend the MRI.

299. That Plaintiff's MRI was rescheduled, but Plaintiff had used her PTO to attend the MRI, so Plaintiff did not report to work.

300. That because Plaintiff did not report to work, she received a write-up for being "no call, no show" because her supervisors insisted that she should have reported for work, despite having the day off using her PTO.

301. That Plaintiff did not sign this write-up.

302. That Smith reported Plaintiff's actions, work ethic, and conduct to Reilly.

303. That Smith would report Plaintiff's actions, work ethic, and conduct to Reilly via radio so that other employees of FedEx could hear the complaints.

304. That Reilly would question Plaintiff's work ethic and whether or not she was able to do her job, following Smith's reports.

305. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage, Plaintiff was responsible for updating spreadsheets with information regarding Defendant's employees checks and for distributing employee checks.

306. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, Plaintiff would update the spreadsheets to reflect if an employee check had been received in the scanner cage to be subsequently distributed.

307. That from February 2018 to April 2018, while Plaintiff was working in the scanner cage distributing employee checks, checks would go missing or appear to be misplaced, even though Plaintiff had updated the spreadsheets to reflect that the checks were received in the scanner cage.

308. That due to checks being missing or misplaced, Plaintiff was forced to stay past 11:00 P.M. to find and distribute the checks to Defendant's employees.

309. That Defendant's employees blamed Plaintiff for the checks being missing and misplaced and it appeared as though Plaintiff was unqualified to perform her duties.

310. That employees of Defendant, including Smith had access to the scanner cage and its contents.

311. That Plaintiff suspects that Smith and other employees of Defendant that had engaged in hostile conduct against Plaintiff were purposefully taking or misplacing employee checks to cause Plaintiff to appear unqualified to perform her duties.

312. That from March 2018 to April 2018, Smith and Reilly would radio Plaintiff and inform her that the slide with packages was filling up to make it seem that Plaintiff was not doing her job.

313. That in March 2018, Smith and Reilly began to alienate Plaintiff from other employees of Defendant FedEx.

314. That in March 2018, in a meeting of Defendant FedEx employees, Reilly informed the meeting's attendees about how much Plaintiff was making and that Plaintiff did not "work her way up" from a lower role within Defendant FedEx's company.

315. That when Plaintiff reported this incident to her supervisor Bill and King, they told her to "take it with a grain of salt."

316.   That when Plaintiff reported Smith's reports to Reilly regarding her conduct to her supervisor Bill and King, she was given a "Code of Business Conduct and Ethics."

317.   That in March 2018, an employee of Defendant FedEx, Amy, approached Plaintiff in the cafeteria while Plaintiff was on the phone with her son.

318.   That Amy is not a supervisory employee of Defendant FedEx.

319.   That while Plaintiff was on the phone with her son, Amy approached Plaintiff and questioned why Plaintiff had her cellphone.

320.   That when Plaintiff told Amy that she was allowed to have her cellphone because of her position within FedEx, Amy reported Plaintiff to her boss, Marcus.

321.   That following Amy's report, Marcus called Plaintiff into his office and asked "why do you think you're here."

322.   That Marcus told Plaintiff that she was brought into his office because she had her cellphone on the warehouse floor and that he would need to issue Plaintiff a write-up.

323.   That Marcus told Plaintiff that he would not issue a write-up because he understood that she was on the phone to speak with her son.

324.   That from March 2018 to April 2018, Bill and King disregarded many of Plaintiff's complaints of harassing and discriminatory conduct by Defendant FedEx employees.

325.   That in March 2018, Plaintiff approached Bill to ask him for the corporate phone number of Defendant FedEx.

326.   That Bill could not provide the phone number for corporate, so he sent Plaintiff to King.

327.   That instead of providing Plaintiff with the corporate phone number, King provided Plaintiff with Bill's phone number, which Plaintiff already had.

328. That in March 2018, Plaintiff was offered a reassignment for her shift be changed so that she did not have to interact with Smith.

329. That the offered reassignment would change Plaintiff's hours from 2:00 P.M. to 11 P.M. to 12:00 A.M. to 5:00 A.M.

330. That Plaintiff felt as though Smith should be the one to change his shift, as he was the harasser.

331. That Plaintiff was unable to accept the shift assignment because her method of transportation to work, the Pace bus, only ran until 11:00 P.M., and Plaintiff had no other method of transportation to accommodate the proposed shift change hours.

332. That in March 2018, a member from Plaintiff's team was promoted, and following this promotion, Reilly called Plaintiff into his office for a private meeting.

333. That in their private meeting, Reilly assigned Plaintiff the duties of her promoted co-worker because "she was the best administrative assistant."

334. That Plaintiff informed Reilly that there was no way that she could fulfill her already assigned duties and the duties of her promoted co-worker.

335. That Plaintiff asked if the duties of her promoted co-worker could be distributed among her team evenly due to Plaintiff's injuries from her January 2018 car accident.

336. That Reilly told Plaintiff she was solely responsible for her promoted co-workers duties because she was paid the most, and that "there should be no problem" with her adopting the duties.

337. That Plaintiff went to HR following this meeting, and King echoed Reilly stating that "there should be no problem."

338. That Plaintiff's already assigned duties required Plaintiff to operate "Slide C," which required Plaintiff to manage 20,000 to 90,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours, to perform quality control, and to assist approximately 17 employees of Defendant in the performance of their duties.

339. That Plaintiff was unable to perform her already assigned duties due to the injuries from her January 2018 car accident and subsequent reassignment to the scanner cage.

340. That the duties of Plaintiff's promoted co-worker required Plaintiff to operate an additional package slide, which could require Plaintiff to manage an additional 20,000 boxes ranging from the size of an envelope to one hundred (100) pounds within four hours.

341. That Plaintiff was unable to perform additional duties due to the injuries from her January 2018 car accident, as the duties of her promoted co-worker required lifting from fifty (50) to one hundred (100) pounds, which often required help.

342. That Reilly assigned Plaintiff these duties after he was aware of Plaintiff's injuries and the accommodations provided by Plaintiff's doctor.

343. That Reilly assigned these duties to Plaintiff because of her complaint against Smith, her higher pay rate, and because of her sex, female.

344. That Reilly questioned Plaintiff after her unwillingness to assume the duties of her promoted co-worker.

345. That Reilly informed Plaintiff that she was required to stay past 11:00 P.M. to finish all of her duties, which included the duties of her promoted co-worker.

346. That Plaintiff informed Reilly that this conflicted with her transportation needs, the Pace bus, which required Plaintiff to take the last bus at 11:00 P.M.

347.   That when Plaintiff informed Reilly that she needed to leave in order to take the 11:00 Pace bus, Reilly asked Plaintiff "are you saying you're not going to do your job?"

348.   That from March 2018 to April 2018, when Plaintiff requested paid time off (PTO), her requests were denied and her supervisors suggested that she switch shifts with other employees.

349.   That Plaintiff was denied the use of her PTO, which she was entitled to use.

350.   That in April 2018, when Plaintiff requested to use her PTO on April 23, 2018 for her son's birthday, her supervisors questioned whether or not she needed to use the PTO and whether she could just switch shifts with another employee, after Plaintiff was originally granted the PTO.

351.   That Plaintiff was unable to switch shifts with other employees due to the alienation she faced after reporting Smith's conduct to the human resources department, and the alienation created by Smith and Reilly.

352.   That as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx, Plaintiff began smoking after being smoke-free for a period of five (5) years.

353.   That as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx, Plaintiff cried every day and dreaded going to work at 2:00 P.M.

354.   That as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of

Defendant FedEx, Plaintiff became angry, distant, and untrusting of her friends, family, and romantic interests.

355.    That as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx, Plaintiff felt as though she was not able to spend time with her son.

356.    That on April 24, 2018, Plaintiff did not return to her employment with Defendant FedEx as a result of the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx.

357.    That Plaintiff did not return to her employment with Defendant FedEx due to mounting stress, anxiety, and strained relationships with her family caused by the severe, extremely offensive, and humiliating sexual harassment from Smith and the hostile work environment created by Reilly and other employees of Defendant FedEx.

358.    That Plaintiff found the sexual harassment by Smith and the sexual discrimination exhibited by Defendant FedEx to be offensive.

359.    That the sexual harassment and sexual discrimination Plaintiff experienced was severe, extremely offensive, humiliating, and effective in creating an unproductive work environment for Plaintiff that substantially interfered with her ability to perform her job.

360.    That said sexual harassment and sexual discrimination adversely affected the terms and conditions of Plaintiff's employment with Defendant FedEx.

361.    That due to the sexual harassment by Smith, the failure to penalize Smith by Defendant, and the sexual discrimination by Defendant, Plaintiff concluded that Defendant and its employees did not want her employed there, and thus, had constructed a work

environment so hostile and intolerable that no reasonable minded person could continue to work effectively within such an environment.

362.    That, consequently, Plaintiff had no other alternative than to not return to work on April 24, 2018, out of concern for her mental health, safety, and well-being, resulting in Plaintiff's termination of employment with Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a.  Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b.  Order a permanent injunction prohibiting Defendant from further acts of sexual harassment and discrimination.

c.  Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d.  Award Plaintiff a judgment against Defendant for reinstatement, front pay, back pay and other compensatory damages.

e.  Award Plaintiff prejudgment interest.

f.  Grant judgment against Defendant for punitive damages as permitted by law, for willful and wanton conduct.

g.  Enter an order requiring Defendant to implement effective steps to eliminate sexual harassment and discrimination from Defendants' workplace.

h.  Grant such other and further relief as this Court deems just and proper.

## Count V

## Illinois Gender Violence Act

363.    Plaintiff incorporates the preceding paragraphs by reference herein.

364.    This count is directed to all Defendants.

365.    While acting within the scope of his employment, Smith subjected Plaintiff to acts of violence and physical aggression satisfying the elements of battery under the laws of Illinois.

366.    Smith intended to engage in offensive and physical contacts with Plaintiff's body.

367.    The acts of gender violence that Smith committed against Plaintiff were committed, at least in part, on the basis of Plaintiff's sex, female.

368.    Defendants encouraged and/or assisted in the acts of gender-related violence when they did nothing to stop Smith's conduct after receiving complaints from Plaintiff.

369.    At various times throughout Plaintiff's employment, Smith sought out opportunities to physically touch Plaintiff in an unwelcome and offensive manner.

370.    Each of the aforementioned actions by Smith were intentional and resulted in conduct that was unwelcome and offensive to Plaintiff.

371.    Defendants ratified Smith's conduct by failing to address or correct Smith's tortious conduct despite Defendants' knowledge of such conduct.

372.    Defendants' failure to address or correct Smith's tortious conduct despite their knowledge is equivalent to encouragement or assistance.

373.    As a direct and proximate result of Smith's and FedEx's conduct, Plaintiff suffered and continues to suffer from depressive mood, increased stressed, anxiety, mental anguish, humiliation, and embarrassment.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a.  Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b.  Order a permanent injunction prohibiting Defendants from further acts of sexual harassment and discrimination.

c.  Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d.  Award Plaintiff a judgment against Defendants for reinstatement, front pay, back pay and other compensatory damages.

e.  Award Plaintiff prejudgment interest.

f.  Grant judgment against Defendants for punitive damages as permitted by law, for willful and wanton conduct.

g.  Enter an order requiring Defendants to implement effective steps to eliminate sexual harassment and discrimination from Defendants' workplace.

h.  Grant such other and further relief as this Court deems just and proper.

## Count VI

## Assault and Battery under Illinois Common Law

374. Plaintiff incorporates the preceding paragraphs by reference herein.

375. This count is directed to all defendants.

376. That while acting within the scope of his employment, Smith subjected Plaintiff to assault in November 2017.

377. That Smith intended to engage in offensive and harmful contacts with Plaintiff's body.

378. That Smith's conduct in touching and attempting to touch Plaintiff placed her in apprehension of imminent physical contacts.

379. That Plaintiff is entitled to be free from willful and wanton conduct.

380. As a direct and proximate result of Smith and FedEx's conduct, Plaintiff suffered and continues to suffer from depressive mood, increased stress, anxiety, mental anguish, humiliation, and embarrassment.

381. That Smith's conduct in subjecting Plaintiff to unwanted and unlawful physical contact was in violation of the law.

382. That Defendant FedEx had notice of the assaults and batteries that Smith was inflicting on Plaintiff.

383.    That FedEx failed to exercise reasonable care in the hiring, retention and supervision of its employees, resulting in Plaintiff being subjected to assault as a result of Smith's behavior and conduct.

384.    That Defendant FedEx could have prevented the repeated assaults and batteries against Plaintiff by taking reasonable care in hiring, supervising, disciplining, or even by firing Smith.

385.    That the aforementioned action by Smith was intentional and resulted in behavior that was unwelcome and offensive to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a.  Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b.  Order a permanent injunction prohibiting Defendants from further acts of sexual harassment and discrimination.

c.  Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d.  Award Plaintiff a judgment against Defendants for reinstatement, front pay, back pay and other compensatory damages.

e.  Award Plaintiff prejudgment interest.

f.  Grant judgment against Defendants for punitive damages as permitted by law, for willful and wanton conduct.

g.  Enter an order requiring Defendants to implement effective steps to eliminate sexual harassment and discrimination from Defendants' workplace.

h.  Grant such other and further relief as this Court deems just and proper.

## Count VII

## Intentional Infliction of Emotional Distress under Illinois Common Law

386.    Plaintiff incorporates the preceding paragraphs by reference herein.

387.    This count is directed to all defendants.

388. That while acting within the scope of his employment, Smith subjected Plaintiff to sexual advances and sexual harassment during her employment.

389. That while acting within the scope of his employment, Smith subjected Plaintiff to physical assaults.

390. That while acting within the scope of his employment, Smith manipulated employees of FedEx to harass and inflict emotional distress on Plaintiff by spreading false rumors about Plaintiff.

391. That Defendant FedEx, through its employee Smith, intentionally inflicted severe emotional distress and mental anguish on Plaintiff.

392. That Smith acted willfully and intentionally in that he knew that Plaintiff would suffer and did suffer extreme emotional and physical distress as a result of Smith's extreme, oppressive and unreasonable conduct.

393. That Smith's conduct amounts to intentional infliction of emotional distress because said conduct was extreme and outrageous and beyond the bounds of moral decency such that no reasonable person could be expected to endure it.

394. That as a result of Smith's conduct, Plaintiff has suffered and continues to suffered severe emotional distress, depressive mood, increased stress, anxiety, mental anguish, humiliation, and embarrassment.

395. That Defendant FedEx could have prevented the repeated extreme and outrageous conduct Smith imposed upon Plaintiff by taking reasonable care in supervising, disciplining, or firing Smith.

396. That as a result of Defendant FedEx's conduct, Plaintiff suffered and continues to suffer from emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to provide the following equitable and legal remedies:

a. Advance this case on the docket, order a speedy hearing at the earliest practicable date and cause this case to be expedited in every possible way.

b. Order a permanent injunction prohibiting Defendants from further acts of sexual harassment and discrimination.

c. Award Plaintiff costs of litigation, including reasonable attorney's fees and expert fees and expenses.

d. Award Plaintiff a judgment against Defendants for reinstatement, front pay, back pay and other compensatory damages.

e. Award Plaintiff prejudgment interest.

f. Grant judgment against Defendants for punitive damages as permitted by law, for willful and wanton conduct.

g. Enter an order requiring Defendants to implement effective steps to eliminate sexual harassment and discrimination from Defendants' workplace.

h. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,
Paris Robinson

By: ____/s/Jack Carney____
One of Her Attorneys

Uche O. Asonye-6209522
Jack Carney- 6329515
Asonye & Associates
100 N. LaSalle Street, Suite 2115
Chicago, IL 60602
(312)795-9110
uasonye@aa-law.com
jcarney@aa-law.com

### JURY DEMAND

NOW COMES Plaintiff, Paris Robinson, by and through her undersigned attorneys, and

hereby demands a trial by jury in the above-entitled causes of action.

Respectfully submitted,
Paris Robinson,


By: ___/s/ Jack Carney_____
         Attorney for Plaintiff

Uche O. Asonye – 6209522
John A. Singer – 6317383
Asonye & Associates
100 N. LaSalle Street, Suite 2115
Chicago, Illinois 60602
(312) 795-9110
uasonye@aa-law.com
jcarney@aa-law.com